**VAULT CORPORATION,**
**Plaintiff-Appellant,**

v.

**QUAID SOFTWARE LIMITED,**
**Defendant-Appellee.**

No. 87–3516.

United States Court of Appeals,
Fifth Circuit.

June 20, 1988.

**256**

Jarrell E. Godfrey, Jr., Kenneth J. Servay, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for Vault Corp.

David Banowetz, Jr., William E. Wright, Jr., Baldwin & Haspel, John P. Manard, Jr., New Orleans, La., for Quaid Software Ltd.

Before REAVLEY, KING and SMITH, Circuit Judges.

REAVLEY, Circuit Judge:

Vault brought this copyright infringement action against Quaid seeking damages and preliminary and permanent injunctions. The district court denied Vault's motion for a preliminary injunction, holding that Vault did not have a reasonable probability of success on the merits. *Vault Corp. v. Quaid Software Ltd.*, 655 F.Supp. 750 (E.D.La.1987). By stipulation of the parties, this ruling was made final and judgment was entered accordingly. We affirm.

**I**

Vault produces computer diskettes under the registered trademark "PROLOK" which are designed to prevent the unauthorized duplication of programs placed on them by software computer companies, Vault's customers. Floppy diskettes serve as a medium upon which computer companies place their software programs. To use a program, a purchaser loads the diskette into the disk drive of a computer, thereby allowing the computer to read the program into its memory. The purchaser can then remove the diskette from the disk drive and operate the program from the computer's memory. This process is repeated each time a program is used.

The protective device placed on a PROLOK diskette by Vault is comprised of two parts: a "fingerprint" and a software program ("Vault's program").[1] The "fingerprint" is a small mark physically placed on the magnetic surface of each PROLOK diskette which contains certain information that cannot be altered or erased. Vault's program is a set of instructions to the computer which interact with the "fingerprint" to prevent the computer from operating the program recorded on a PROLOK diskette (by one of Vault's customers) unless the computer verifies that the *original* PROLOK diskette, as identified by the "fingerprint," is in the computer's disk drive. While a purchaser can copy a PROLOK protected program onto another diskette, the computer will not read the program into its memory from the copy unless the original PROLOK diskette is also in one of the computer's disk drives. The fact that a fully functional copy of a program cannot be made from a PROLOK diskette prevents purchasers from buying

---

1. A PROLOK diskette contains two programs, the program placed on the diskette by a software company (e.g, word processing) and the program placed on the diskette by Vault which interacts with the "fingerprint" to prevent the unauthorized duplication of the software company's program. We use the term "software program" or "program" to refer to the program placed on the diskette by one of Vault's customers (a computer company) and "Vault's program" to refer to the program placed on the diskette by Vault as part of the protective device. We collectively refer to the "fingerprint" and Vault's program as the "protective device."

a single program and making unauthorized copies for distribution to others.

Vault produced PROLOK in three stages. The original commercial versions, designated as versions 1.01, 1.02, 1.03, 1.04 and 1.06 ("version 1.0") were produced in 1983. Vault then incorporated improvements into the system and produced version 1.07 in 1984. The third major revision occurred in August and September of 1985 and was designated as versions 2.0 and 2.01 ("version 2.0"). Each version of PROLOK has been copyrighted and Vault includes a license agreement with every PROLOK package that specifically prohibits the copying, modification, translation, decompilation or disassembly of Vault's program.[2] Beginning with version 2.0 in September 1985, Vault's license agreement contained a choice of law clause adopting Louisiana law.[3]

Quaid's product, a diskette called "CopyWrite," contains a feature called "RAMKEY" which unlocks the PROLOK protective device and facilitates the creation of a fully functional copy of a program placed on a PROLOK diskette. The process is performed simply by copying the contents of the PROLOK diskette onto the CopyWrite diskette which can then be used to run the software program *without* the original PROLOK diskette in a computer disk drive. RAMKEY interacts with Vault's program to make it appear to the computer that the CopyWrite diskette contains the "fingerprint," thereby making the computer function as if the original PROLOK diskette is in its disk drive. A copy of a program placed on a CopyWrite diskette can be used without the original, and an unlimited number of fully functional copies can be made in this manner from the program originally placed on the PROLOK diskette.

Quaid first developed RAMKEY in September 1983 in response to PROLOK version 1.0. In order to develop this version of RAMKEY, Quaid copied Vault's program into the memory of its computer and analyzed the manner in which the program operated. When Vault developed version 1.07, Quaid adapted RAMKEY in 1984 to defeat this new version. The adapted version of RAMKEY contained a sequence of approximately 30 characters found in Vault's program and was discontinued in July 1984. Quaid then developed the cur-

---

**2.** The license agreement refers to the program placed on the diskette by Vault, not the software program placed on the diskette by Vault's customers. *See supra* note 1 for terminology. The companies that place their software programs on PROLOK diskettes, not Vault, own the copyright to their programs and may include a license agreement covering their programs in the package for sale to the public.

Vault's license agreement reads:
IMPORTANT! VAULT IS PROVIDING THE ENCLOSED MATERIALS TO YOU ON THE EXPRESS CONDITION THAT YOU ASSENT TO THIS SOFTWARE LICENSE. BY USING ANY OF THE ENCLOSED DISKETTE(S), YOU AGREE TO THE FOLLOWING PROVISIONS. IF YOU DO NOT AGREE WITH THESE LICENSE PROVISIONS, RETURN THESE MATERIALS TO YOUR DEALER, IN ORIGINAL PACKAGING WITHIN 3 DAYS FROM RECEIPT, FOR A REFUND.
1. This copy of the PROLOK Software Protection System and this PROLOK Software Protection Diskette (the "Licensed Software") are licensed to you, the end-user, for your own internal use. Title to the Licensed Software and all copyrights and proprietary rights in the Licensed Software shall remain with VAULT. You may not transfer, sublicense, rent, lease, convey, copy, modify, translate,

convert to another programming language, decompile or disassemble the Licensed Software for any purpose without VAULT's prior written consent.
2. THE LICENSED SOFTWARE IS PROVIDED "AS-IS". VAULT DISCLAIMS ALL WARRANTIES AND REPRESENTATIONS OF ANY KIND WITH REGARD TO THE LICENSED SOFTWARE, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. UNDER NO CIRCUMSTANCES WILL VAULT BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL OR EXEMPLARY DAMAGES EVEN IF VAULT IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING. SOME STATES DO NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

**3.** The license agreement included the following language beginning with version 2.0:

To the extent the laws of the United States of America are not applicable, this license agreement shall be governed by the laws of the State of Louisiana.

rent version of RAMKEY which also operates to defeat PROLOK version 1.07, but does not contain the sequence of characters used in the discontinued version. Quaid has not yet modified RAMKEY to defeat PROLOK version 2.0, and has agreed not to modify RAMKEY pending the outcome of this suit. Robert McQuaid, the sole owner of Quaid, testified in his deposition that while a CopyWrite diskette can be used to duplicate programs placed on all diskettes, whether copy-protected or not, the only purpose served by RAMKEY is to facilitate the duplication of programs placed on copy-protected diskettes. He also stated that without the RAMKEY feature, CopyWrite would have no commercial value.

## II

Vault brought this action against Quaid seeking preliminary and permanent injunctions to prevent Quaid from advertising and selling RAMKEY, an order impounding all of Quaid's copies of CopyWrite which contain the RAMKEY feature, and monetary damages in the amount of $100,-000,000. Vault asserted three copyright infringement claims cognizable under federal law, 17 U.S.C. § 101 *et seq.* (1977 & Supp.1988) (the "Copyright Act"), which included: (1) that Quaid violated 17 U.S.C. §§ 501(a) & 106(1) by copying Vault's program into its computer's memory for the purpose of developing a program (RAM-KEY) designed to defeat the function of Vault's program; (2) that Quaid, through RAMKEY, contributes to the infringement of Vault's copyright and the copyrights of its customers in violation of the Copyright Act as interpreted by the Supreme Court in *Sony Corp. of Am. v. Universal City Studios,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); and (3) that the second version of RAMKEY, which contained approximately thirty characters from PRO-LOK version 1.07, and the latest version of RAMKEY, constitute "derivative works" of Vault's program in violation of 17 U.S.C. §§ 501(a) & 106(2). Vault also asserted two claims based on Louisiana law, contending that Quaid breached its license agreement by decompiling or disas-

sembling Vault's program in violation of the Louisiana Software License Enforcement Act, La.Rev.Stat.Ann. § 51:1961 *et seq.* (West 1987), and that Quaid misappropriated Vault's program in violation of the Louisiana Uniform Trade Secrets Act, La. Rev.Stat.Ann. § 51:1431 *et seq.* (West 1987).

The district court originally dismissed Vault's complaint for lack of in personam jurisdiction. This court reversed the district court's order of dismissal and remanded the case for further proceedings. *Vault Corp. v. Quaid Software Ltd.,* 775 F.2d 638 (5th Cir.1985). On remand, the district court, after a three-day bench trial, denied Vault's motion for a preliminary injunction holding that Vault had not established a reasonable probability of success on the merits. *Vault,* 655 F.Supp. at 763. Subsequently, the parties agreed to submit the case for final decision based on the evidence adduced at the preliminary injunction trial. On July 31, 1987 the district court entered final judgment in accordance with its decision on the preliminary injunction.

Vault now contends that the district court improperly disposed of each of its claims.

### III. Vault's Federal Claims

An owner of a copyrighted work has the exclusive right to reproduce the work in copies, to prepare derivative works based on the copyrighted work, to distribute copies of the work to the public, and, in the case of certain types of works, to perform and display the work publicly. 17 U.S.C. § 106. Sections 107 through 118 of the Copyright Act limit an owner's exclusive rights, and section 501(a) provides that "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 ... is an infringer of the copyright."

It is not disputed that Vault owns the copyright to the program it places on PRO-LOK diskettes and is thus an "owner of copyright" under § 106. Therefore, Vault has, subject to the exceptions contained in sections 107 through 118, the exclusive

right to reproduce its program in copies and to prepare derivative works based on its program. Vault claims that Quaid infringed its copyright under § 501(a) by: (1) directly copying Vault's program into the memory of Quaid's computer; (2) contributing to the unauthorized copying of Vault's program and the programs Vault's customers place on PROLOK diskettes; and (3) preparing derivative works of Vault's program.

Section 117 of the Copyright Act limits a copyright owner's exclusive rights under § 106 by permitting an owner of a computer program to make certain copies of that program without obtaining permission from the program's copyright owner. With respect to Vault's first two claims of copyright infringement, Quaid contends that its activities fall within the § 117 exceptions and that it has, therefore, not infringed Vault's exclusive rights under § 501(a). To appreciate the arguments of the parties, we examine the legislative history of § 117.

### A. Background

In 1974 Congress established the National Commission on New Technological Uses of Copyrighted Works (the "CONTU") to perform research and make recommendations concerning copyright protection for computer programs. Before receiving the CONTU's recommendations, Congress amended the Copyright Act in 1976[4] to include computer programs in the definition of protectable literary works[5] and to establish that a program copied into a computer's memory constitutes a reproduction.[6] Congress delayed further action and enacted an interim provision[7] to maintain the status quo until the CONTU completed its study and made specific recommendations.

In 1978 the CONTU issued its final report[8] in which it recognized that "[t]he cost of developing computer programs is far greater than the cost of their duplication," CONTU Report at 26, and concluded that "some form of protection is necessary to encourage the creation and broad distribution of computer programs in a competitive market," *id.* at 27. After acknowledging the importance of balancing the interest of proprietors in obtaining "reasonable protection" against the risks of "unduly burdening users of programs and the general public," *id.* at 29, the Report recommended

---

4. The 1976 Amendments did not primarily address computer-related copyright protection. The Amendments eliminated common-law copyright, simplified copyright procedure, and rejected the distinction between the protection of published and unpublished works. *See* T. Harris, *The Legal Guide to Software Protection* 43–44 (1985).

5. The definition of "literary works" was amended to include:

> works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

17 U.S.C. § 101 (1977). A House Report stated that "[t]he term 'literary works' ... also includes computer data bases, and computer programs to the extent that they incorporate authorship in the programmer's expression of original ideas, as distinguished from the ideas themselves." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 54, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5667. Section 102 specifies that copyright protection exists in "original works of authorship," which is defined to include "literary works." 17 U.S.C. § 102(a)(1).

6. Section 102(a) was amended to protect original works of authorship which can be reproduced "either directly or with the aid of a machine or device." 17 U.S.C. § 102(a) (1977).

7. 17 U.S.C. § 117 (1977). This section provided:

> Notwithstanding the provisions of sections 106 through 116 and 118, this title does not afford to the owner of copyright in a work any greater or lesser rights with respect to the use of the work in conjunction with automatic systems capable of storing, processing, retrieving, or transferring information, or in conjunction with any similar device, machine, or process, than those afforded to works under the law, whether title 17 or the common law or statutes of a State, in effect on December 31, 1977, as held applicable and construed by a court in an action brought under this title.

8. Final Report of the National Commission on New Technological Uses of Copyrighted Works (July 31, 1978) (the "CONTU Report" or the "Report").

the repeal of section 117 [9] (the interim provision) and the enactment of a new section 117 which would proscribe the unauthorized copying of computer programs [10] but permit a "rightful possessor" of a program

to make or authorize the making of another copy or adaptation of that computer program *provided:*

(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

(2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

*Id.* at 29–30 (emphasis in original).

Because the act of loading a program from a medium of storage into a computer's memory creates a copy of the program, the CONTU reasoned that "[o]ne who rightfully possesses a copy of a program ... should be provided with a legal right to copy it to that extent which will permit its use by the possessor," and drafted proposed § 117(1) to "provide that persons in rightful possession of copies of programs be able to use them freely without fear of

exposure to copyright liability." *Id.* at 31. With respect to proposed section 117(2), the "archival exception," the Report explained that a person in rightful possession of a program should have the right "to prepare archival copies of it to guard against destruction or damage by mechanical or electrical failure. But this permission would not extend to other copies of the program. Thus one could not, for example, make archival copies of a program and later sell some to another while retaining some for use." *Id.*

In 1980, Congress enacted the Computer Software Copyright Act which adopted the recommendations contained in the CONTU Report. Section 117 was repealed, proposed section 117 [11] was enacted, and the proposed definition of "computer program" was added to section 101. The Act's legislative history, contained in a short paragraph in a committee report, merely states that the Act, "embodies the recommendations of [the CONTU] with respect to clarifying the law of copyright of computer software." H.R.Rep. No. 1307, 96th Cong., 2d Sess., pt. 1, at 23, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6460, 6482. The absence of an extensive legislative history and the fact that Congress enacted proposed section 117 with only one

**9.** With respect to the repeal of § 117, the Report reasoned that

[s]ection 117, designed to subject computer uses of copyrighted works to treatment under the old law, vitiates that proscription, at least insofar as machine-readable versions are not "copies" under the 1909 Act. Therefore, to prevent any question about the impropriety of program piracy, and to assure that all works of authorship are treated comparably under the new law, Section 117 should be repealed.

CONTU Report at 30–31 (footnotes omitted).

**10.** The Report recommended that § 101 be amended to add the definition of a "computer program" as, "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." CONTU Report at 30.

**11.** In enacting the new section 117, Congress adopted the proposed section with only one change. The final version grants "owners," as opposed to "rightful possessors," a limited right to copy and adapt their software. Amended section 117 reads, in full,

Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

(2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.

17 U.S.C. § 117 (Supp.1988).

change [12] have prompted courts to rely on the CONTU Report as an expression of legislative intent. *See Micro-Sparc, Inc. v. Amtype Corp.,* 592 F.Supp. 33, 35 (D.Mass. 1984); *Atari, Inc. v. JS & A Group, Inc.,* 597 F.Supp. 5, 9 (N.D.Ill.1983); *Midway Mfg. Co. v. Strohon,* 564 F.Supp. 741, 750 n. 6 (N.D.Ill.1983).

### B. Direct Copying

■ In order to develop RAMKEY, Quaid analyzed Vault's program by copying it into its computer's memory. Vault contends that, by making this unauthorized copy, Quaid directly infringed upon Vault's copyright. The district court held that "Quaid's actions clearly fall within [the § 117(1)] exemption. The loading of [Vault's] program into the [memory] of a computer is an 'essential step in the utilization' of [Vault's] program. Therefore, Quaid has not infringed Vault's copyright by loading [Vault's program] into [its computer's memory]." *Vault,* 655 F.Supp. at 758.

Section 117(1) permits an owner of a program to make a copy of that program provided that the copy "is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." Congress recognized that a computer program cannot be used unless it is first copied into a computer's memory, and thus provided the § 117(1) exception to permit copying for this essential purpose. *See* CONTU Report at 31. Vault contends that, due to the inclusion of the phrase "and that it is used in no other manner," this exception should be interpreted to permit only the copying of a computer program for the purpose of using it for *its intended purpose.* Because Quaid copied

Vault's program into its computer's memory for the express purpose of devising a means of defeating its protective function, Vault contends that § 117(1) is not applicable.

We decline to construe § 117(1) in this manner. Even though the copy of Vault's program made by Quaid was *not* used to prevent the copying of the program placed on the PROLOK diskette by one of Vault's customers (which is the purpose of Vault's program), and was, indeed, made for the express purpose of devising a means of defeating its protective function, the copy made by Quaid *was* "created as an essential step in the utilization" of Vault's program. Section 117(1) contains no language to suggest that the copy it permits must be employed for a use intended by the copyright owner, and, absent clear congressional guidance to the contrary, we refuse to read such limiting language into this exception. We therefore hold that Quaid did not infringe Vault's exclusive right to reproduce its program in copies under § 106(1).

### C. Contributory Infringement

Vault contends that, because purchasers of programs placed on PROLOK diskettes use the RAMKEY feature of CopyWrite to make unauthorized copies, Quaid's advertisement and sale of CopyWrite diskettes with the RAMKEY feature violate the Copyright Act by contributing to the infringement of Vault's copyright and the copyrights owned by Vault's customers. Vault asserts that it lost customers and substantial revenue as a result of Quaid's contributory infringement because software companies which previously relied on PROLOK diskettes to protect their programs from unauthorized copying have discontinued their use.[13]

12. *See supra* note 11.

13. Despite the legal protection provided by the amended Copyright Act to proprietors of computer programs, the unauthorized copying and distribution of programs has escalated. In 1983 it was estimated that twenty to thirty percent of the computer software industry's revenues were siphoned off annually by piracy and the unauthorized resale of software. Nat'l OTC Stock J., April 25, 1983 at 5. Joseph Curry, a survey and

statistical analyst, testified that a 1984 survey conducted by him indicated that for every authorized copy of computer software in use there is one unauthorized copy. He estimated that the loss of income to software manufacturers resulting from unauthorized copies was approximately $1.3 billion from 1981 to 1984, $800 million in 1985, and $800 million in 1986. To combat software piracy, companies such as Vault developed protective devices designed to prevent unauthorized copying. In response,

While a purchaser of a program on a PROLOK diskette violates sections 106(1) and 501(a) by making and distributing unauthorized copies of the program, the Copyright Act "does not expressly render anyone liable for the infringement committed by another." *Sony*, 464 U.S. at 434, 104 S.Ct. at 785. The Supreme Court in *Sony*, after examining the express provision in the Patent Act which imposes liability on an individual who "actively induces infringement of a patent," 35 U.S.C. § 271(b) & (c), and noting the similarity between the Patent and Copyright Acts, recognized the availability, under the Copyright Act, of vicarious liability against one who sells a product that is used to make unauthorized copies of copyrighted material. *Id.* at 434–42, 104 S.Ct. at 785–89. The Court held that liability based on contributory infringement could be imposed only where the seller had constructive knowledge of the fact that its product was used to make unauthorized copies of copyrighted material, *id.* at 339, 104 S.Ct. at 787, and that the sale of a product "does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses." *Id.* at 442, 104 S.Ct. at 789.

While Quaid concedes that it has actual knowledge that its product is used to make unauthorized copies of copyrighted material, it contends that the RAMKEY portion of its CopyWrite diskettes serves a substantial noninfringing use by allowing purchasers of programs on PROLOK diskettes to make archival copies as permitted under 17 U.S.C. § 117(2), and thus that it is not liable for contributory infringement. The district court held that Vault lacked standing to raise a contributory infringement claim because "it is not Vault, but the customers of Vault who place their programs on PROLOK disks, who may assert such claims. Clearly the copyright rights

to these underlying programs belong to their publishers, not Vault." *Vault*, 655 F.Supp. at 759. Alternatively the court held that CopyWrite is capable of "commercially significant noninfringing uses" because the RAMKEY feature permits the making of archival copies of copy-protected software, and CopyWrite diskettes (without the RAMKEY feature) are used to make copies of unprotected software and as a diagnostic tool to analyze the quality of new computer programs. *Id.* Therefore, the court held that the sale of CopyWrite did not constitute contributory infringement.

While we hold that Vault has standing to assert its contributory infringement claim, we find that RAMKEY is capable of substantial noninfringing uses and thus reject Vault's contention that the advertisement and sale of CopyWrite diskettes with RAMKEY constitute contributory infringement.

### 1. *Standing*

■ The Copyright Act provides that the "legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of sections 205(d) and 411 [concerning the recordation and registration of copyrights], to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). The Supreme Court in *Sony* noted that it was the taping of plaintiff's "own copyrighted programs that provides them with standing to charge Sony with contributory infringement." 464 U.S. at 434, 104 S.Ct. at 785.

The focus of Vault's allegation of contributory infringement in its amended complaint is that CopyWrite, through RAMKEY, enables purchasers of PROLOK protected programs to infringe the copyrights of Vault's customers and that, as a result, Vault has suffered damages due to its loss

---

companies like Quaid developed "code-breakers" which are products that operate to defeat protective devices and permit a possessor of a program to make copies. Manufacturers of code-breakers justify their business by contending that protective devices prevent a purchaser of a program from making archival copies un-

der § 117(2) and that their product serves to facilitate the legitimate creation of such copies. *See* Note, *17 U.S.C. § 117: Is the Amendment to the Copyright Act Adequate to Regulate the Computer Software Market?*, 7 Computer/Law J. 227, 232 (1986).

of customers. While Vault does not own the copyrights to its customer's programs, it does own the copyright to the program it places on each PROLOK diskette. This program operates in conjunction with the "fingerprint" to prevent the duplication of Vault's customer's programs. Uncontroverted testimony established that both Vault's protective program and its customer's program are copied onto a CopyWrite diskette when an individual executes a computer's "copy" function in order to duplicate the customer's program from a PROLOK diskette onto a CopyWrite diskette, and that RAMKEY then interacts with Vault's program to defeat its protective function and to make the computer operate as if the original PROLOK diskette was in one of its disk drives.[14] Therefore, CopyWrite diskettes, through RAMKEY, facilitate not only the copying of Vault's customer's software programs but also the copying of Vault's protective program, and, in addition, RAMKEY interacts with Vault's program to destroy its purpose.

Quaid does not take issue with the validity of Vault's copyright under § 501(b) but instead contends that Vault lacks standing because it failed to allege contributory infringement based on the copying of its program, as opposed to the programs of its customers. Vault responds that its pleadings should be broadly construed to include its contributory infringement claim based on the copying of its program, and that even if its pleadings are narrowly construed, they were amended, pursuant to Fed.R.Civ.P. 15(b), to include this claim by trial testimony which established that Quaid's product contributes to the unauthorized copying of Vault's program.

Rule 15(b) provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." While Vault's pleadings do not allege con-

tributory infringement based on the copying of its copyrighted program, Quaid's consent to this claim is evidenced by a pretrial memorandum, signed by counsel for both Vault and Quaid, which listed as a contested issue of law "[w]hether Quaid has contributorily infringed *Vault's* and Vault's customer copyrights" (emphasis added). Quaid does not contend that it has been unfairly prejudiced by Vault's contention of contributory infringement based on the copying of its own program, *see Mason v. Hunter*, 534 F.2d 822, 825 (8th Cir.1976), nor does Quaid contend that it had inadequate notice of the nature of Vault's claim or an inadequate opportunity to fully and fairly respond, *see Henry v. Coahoma County Bd. of Educ.*, 246 F.Supp. 517, 519 (N.D.Miss.1963), *aff'd*, 353 F.2d 648 (5th Cir.1965), *cert. denied*, 384 U.S. 962, 86 S.Ct. 1586, 16 L.Ed.2d 674 (1966). Vault's proposed interpretation or amendment of its pleadings in no way changes the character of the case. *See id.* at 518. It is beyond dispute that RAMKEY destroys the commercial value of PROLOK diskettes, and while the extent of Vault's damages were not fully developed at trial, the evidence indicated that Vault sustained substantial injuries as a result of RAMKEY and thus has a significant personal stake in the outcome of this litigation. Under these circumstances, we hold that, pursuant to Fed.R.Civ.P. 15(b), Vault has fairly alleged contributory infringement of its copyrighted program and has standing to pursue this claim.

### 2. *Substantial Noninfringing Uses of RAMKEY*

Vault's allegation of contributory infringement focuses on the RAMKEY feature of CopyWrite diskettes, not on the non-RAMKEY portions of these diskettes. Vault has no objection to the advertising and marketing of CopyWrite diskettes without the RAMKEY feature, and this

**14.** The latest version of RAMKEY, developed in response to PROLOK version 1.07, operates by intercepting service calls made by Vault's program to the computer. By this process, RAMKEY is able to make the computer operate as if the original PROLOK diskette, rather than the

CopyWrite diskette with RAMKEY, is in the computer's disk drive. *See* McQuaid Deposition at 68–72. In order for RAMKEY to perform this function, Vault's protective program, as well as Vault's customer's program, must be copied onto the CopyWrite diskette.

feature is separable from the underlying diskette upon which it is placed.[15] Therefore, in determining whether Quaid engaged in contributory infringement, we do not focus on the substantial noninfringing uses of CopyWrite,[16] as opposed to the RAMKEY feature itself. *See Vault,* 655 F.Supp. at 759. The issue properly presented is whether the RAMKEY feature has substantial noninfringing uses.

The starting point for our analysis is with *Sony.* The plaintiffs in *Sony,* owners of copyrighted television programs, sought to enjoin the manufacture and marketing of Betamax video tape recorders ("VTR's"), contending that VTR's contributed to the infringement of their copyrights by permitting the unauthorized copying of their programs. 464 U.S. at 419–20, 104 S.Ct. at 777. After noting that plaintiffs' market share of television programming was less than 10%, and that copyright holders of a significant quantity of television broadcasting authorized the copying of their programs, the Court held that VTR's serve the legitimate and substantially noninfringing purpose of recording these programs, as well as plaintiffs' programs, for future viewing (authorized and unauthorized[17] time-shifting respectively), and therefore rejected plaintiffs' contributory

infringement claim. *Id.* at 442–55, 104 S.Ct. at 789–95.

Quaid asserts that RAMKEY serves the legitimate purpose of permitting purchasers of programs recorded on PROLOK diskettes to make archival copies under § 117(2) and that this purpose constitutes a substantial noninfringing use. At trial, witnesses for Quaid testified that software programs placed on floppy diskettes are subject to damage by *physical and human mishap* [18] and that RAMKEY protects a purchaser's investment by providing a fully functional archival copy that can be used if the original program on the PROLOK protected diskette, or the diskette itself, is destroyed. Quaid contends that an archival copy of a PROLOK protected program, made without RAMKEY, does not serve to protect against these forms of damage because a computer will not read the program into its memory from the copy unless the PROLOK diskette containing the original undamaged program is also in one of its disk drives, which is impossible if the PROLOK diskette, or the program placed thereon, has been destroyed due to physical or human mishap.

Computer programs can be stored on a variety of mediums, including floppy diskettes, hard disks, non-erasable read only

---

**15.** Quaid licensed the RAMKEY feature itself (and not the underlying CopyWrite diskette) to at least one company which then used RAMKEY, in conjunction with diskettes it marketed, to permit its customers to make fully functioning copies of programs recorded on PROLOK diskettes. McQuaid Deposition at 156 & 181–83.

**16.** The district court held that CopyWrite has "commercially significant noninfringing uses" in part because CopyWrite diskettes are used to copy unprotected software and as a diagnostic tool to analyze the quality of new computer programs. *Vault,* 655 F.Supp. at 759. The findings upon which this holding is based are irrelevant to a determination of whether RAMKEY has a substantial noninfringing use. While CopyWrite diskettes may serve legitimate functions, Robert McQuaid admitted that, without RAMKEY, CopyWrite would have no commercial value.

**17.** The Court held that the unauthorized time-shifting of plaintiffs' television programs was not an infringement of their copyrights because time-shifting involved an unharmful noncom-

mercial activity which constituted "fair use" under 17 U.S.C. § 107. *Sony,* 464 U.S. at 447–55, 104 S.Ct. at 791–95.

**18.** John Kurko, a technical support engineer, testified that he used CopyWrite to protect against physical mishaps such as house fires and other catastrophies. Trial Record ("T.R.") at 323. Warren Steinke, an administrative assistant at an insurance brokerage business, testified that back-up copies of computer programs were important to protect against damage due to experimentation with the original program and physical mishaps such as bending the diskette. T.R. at 325 & 331. Michael Kirk-Duggan, a professor at the University of Texas, testified that he makes back-up copies to protect against human error, T.R. at 335, and Peter Stone, a copy protection consultant, testified that a PROLOK diskette is subject to damage by liquids, severe heat and sharp objects. T.R. at 422. Finally, Robert McQuaid, in his deposition, testified that floppy diskettes can wear out and programs placed on floppy diskettes can be erased by human error. McQuaid Deposition at 16 & 18.

memory ("ROM") chips, and a computer's random access memory, and may appear only as printed instructions on a sheet of paper. Vault contends that the archival exception was designed to permit *only* the copying of programs which are subject to "destruction or damage by *mechanical or electrical failure.*" CONTU Report at 31 (emphasis added). While programs stored on all mediums may be subject to damage due to physical abuse or human error, programs stored on certain mediums are not subject to damage by mechanical or electrical failure.[19] Therefore, Vault argues, the medium of storage determines whether the archival exception applies, thus providing only owners of programs, placed on mediums of storage which subject them to damage by mechanical or electrical failure, the right to make back-up copies. To support

its construction of § 117(2), Vault notes that one court has held that the archival exception does not apply to the copying of programs stored on ROM chips where there was no evidence that programs stored on this medium were subject to damage by mechanical or electrical failure, *Atari*, 597 F.Supp. at 9–10,[20] and another court has likewise held that the archival exception does not apply to the copying of programs which appear only in the form of printed instructions in a magazine, *Micro-Sparc*, 592 F.Supp. at 35–36.[21]

Vault contends that the district court's finding that programs stored on floppy diskettes are subject to damage by mechanical or electrical failure is erroneous because there was insufficient evidence presented at trial to support it,[22] and, based

19. The CONTU Report did not define the term "mechanical or electrical failure." At trial, Ray Strackbein, the head of Vault's engineering department, testified that "mechanical failure" results from damage to a storage medium's recording surface, while "electrical failure" results from the erasure or reformatting of the program. T.R. at 255–56. A program recorded on a floppy diskette would be subject to mechanical or electrical failure, if subject to this type of failure at all, only while the diskette upon which it is recorded is in a computer's disk drive. Strackbein, T.R. at 256–57.

20. The court in *Atari* held that:

The dangers to ROMs presented by [defendant] are *physical* dangers not unlike the risk that a handwritten computer program will be shredded accidentally. Virtually every copy of a copyrighted work, be it a book, a phonograph record, or a videotape, faces that kind of risk. Yet Congress did not enact a general rule that making back-up copies of copyrighted works would not infringe. Rather, according to the CONTU report, it limited its exception to computer programs which are subject to "destruction or damage by mechanical or electrical failure." Some media must be especially susceptible to this danger. [Defendant] has simply offered no evidence that a ROM in a 2600–compatible video game cartridge is such a medium.

597 F.Supp. at 9–10 (emphasis in original) (footnote omitted). The court noted that, other than the § 117 exceptions, the Copyright Act contains only three other exceptions for "archival" copying:

Libraries and archives may copy an unpublished work "for purposes of preservation and security...." 17 U.S.C. § 108(b). These institutions may also make a replacement copy of a published work that is "damaged, deteriorat-

ing, lost, or stolen, if the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price." 17 U.S.C. § 108(c). Finally, § 112 provides several exceptions for archival copying of various "ephermeral" works, such as the broadcast of a live performance of a copyrighted play. *See* 2 *Nimmer on Copyright* § 806.

*Id.* at 10 n. 2.

21. In *Micro-Sparc*, the plaintiff published a weekly magazine containing computer programs which subscribers could type into their computers. The defendant typed programs contained in plaintiff's magazine into a computer and then transferred these programs onto a "master disk." From the master disk, the defendant copied the programs onto blank diskettes and then sold these diskettes to subscribers of plaintiff's magazine. 592 F.Supp. at 34.

In response to plaintiff's claim that defendant's "typing service" constituted copyright infringement, defendant contended that it was making back-up copies of programs which appeared in plaintiff's magazine and that its activity therefore fell within the "archival exception." The court rejected this defense, holding that when a subscriber to plaintiff's magazine "orders a disk from the defendant, he possesses the programs as they appear in the magazine. In this printed form, the programs are susceptible only to physical dangers, such as accidental shredding." *Id.* at 35.

22. Ray Strackbein, the head of Vault's engineering department, testified that programs recorded on diskettes are not subject to damage by electrical failure. T.R. at 255. There was no testimony to indicate that programs recorded on diskettes are subject to damage by mechanical

on this contention, Vault asserts that the archival exception does not apply to permit the unauthorized copying of these programs. Vault performed a trial demonstration to prove that even if a program on an original PROLOK diskette, and Vault's protective program, were completely erased from this diskette, these programs could be restored on the original diskette using a copy made *without* RAMKEY. Therefore, Vault argues that even if a program recorded on a PROLOK diskette is subject to damage by mechanical or electrical failure, the non-operational copy of a PROLOK protected program made without RAMKEY is sufficient to protect against this type of damage. Vault concludes that, in light of the fact that RAMKEY facilitates the making of unauthorized copies and owners of PROLOK protected programs can make copies to protect against damage by mechanical and electrical failure without RAMKEY, the RAMKEY feature is not capable of substantial noninfringing uses.

■ The narrow construction of the archival exception, advanced by Vault and accepted in the *Atari* and *Micro-Sparc* decisions, has undeniable appeal. This con-

struction would leave the owner of a protected software program free to make back-up copies of the software to guard against erasures, which is probably the primary concern of owners as well as the drafters of the CONTU Report. Software producers should perhaps be entitled to protect their product from improper duplication, and Vault's PROLOK may satisfy producers and most purchasers on this score—*if* PROLOK cannot be copied by the purchaser onto a CopyWrite diskette without infringing the PROLOK copyright. That result does have appeal, but we believe it is an appeal that must be made to Congress. "[I]t is not our job to apply laws that have not yet been written." *Sony*, 464 U.S. at 456, 104 S.Ct. at 796. We read the statute as it is now written to authorize the owner of the PROLOK diskette to copy both the PROLOK program and the software program for any reason [23] so long as the owner uses the copy for archival purposes only and not for an unauthorized transfer.

The CONTU Report's words of "mechanical or electrical failure" are contained in a paragraph quoted in the footnote.[24] We

failure. The only contrary evidence was presented by Warren Steinke who testified that CopyWrite protected against damage due to "a head crash," "a voltage break" or "static electricity," T.R. at 331, all of which suggest that programs recorded on diskettes are subject to damage by electrical failure. Steinke is not a computer programmer by profession, T.R. at 326, but works as an administrative assistant in an insurance brokerage business, and his testimony was clearly controverted by that of Strackbein.

**23.** The trial court found:

It is an ordinary practice of computer users to purchase computer software and immediately make archival backup copies of that software. This is done in order to assure the user that in the event of mechanical, electrical or physical damage to the software program or disks, a functional backup copy is available for use.

*Vault*, 655 F.Supp. at 754.

**24.** Because the placement of a work into a computer is the preparation of a copy, the law should provide that persons in rightful possession of copies of programs be able to use them freely without fear of exposure to copyright liability. Obviously, creators, lessors,

licensors and vendors of copies of programs intend that they be used by their customers, so that rightful users would but rarely need a legal shield against potential copyright problems. It is easy to imagine, however, a situation in which the copyright owner might desire, for good reason or none at all, to force a lawful owner or possessor of a copy to stop using a particular program. One who rightfully possesses a copy of a program, therefore, should be provided with a legal right to copy it to that extent which will permit its use by that possessor. This would include the right to load it into a computer and to prepare archival copies of it to guard against destruction or damage by mechanical or electrical failure. But this permission would not extend to other copies of the program. Thus one could not, for example, make archival copies of a program and later sell some to another while retaining some for use. The sale of a copy of a program by a rightful possessor to another must be of all rights in the program, thus creating a new rightful possessor and destroying that status as regards the seller. This is in accord with the intent of that portion of the law which provides that owners of authorized copies of a copyrighted work may sell those copies without leave of the copyright proprietor.

read the stated causes of damage to be illustrative only, and not exclusive. Similarly, the statement follows with the prohibited use of the archival copies which does not include a prohibition against copying for purposes other than to protect against "mechanical or electrical failure." The Report, or Congress, could have easily limited the scope of § 117(2) to authorize the making of archival copies of programs subject to damage, and to guard against, only mechanical or electrical failure. CONTU did not recommend that language, nor did Congress enact it. Congress, following CONTU's advice, provided that an owner of a computer program may make a copy of that program provided that "such new copy ... is for archival purposes only." 17 U.S.C. § 117(2). Congress did not choose to spell out detailed restrictions on the copying as was done in sections 108 and 112. Congress imposed no restriction upon the purpose or reason of the owner in making the archival copy; only the use made of that copy is restricted. *See* CONTU Report at 31 ("one could not, for example, make archival copies of a program and later sell some to another while retaining some for use"). An owner of a program is entitled, under § 117(2), to make an archival copy of that program in order to guard against *all* types of risks, including physical and human mishap as well as mechanical and electrical failure.

A copy of a PROLOK protected program made with RAMKEY protects an owner from all types of damage to the original program, while a copy made without RAMKEY only serves the limited function of protecting against damage to the original program by mechanical and electrical failure. Because § 117(2) permits the making of fully functional archival copies, it follows that RAMKEY is capable of substantial noninfringing uses. Quaid's advertisement and sale of CopyWrite diskettes with the RAMKEY feature does not constitute contributory infringement.

### D. Derivative Work

Section 106(2) of the Copyright Act provides the copyright owner exclusive rights "to prepare derivative works based on the copyrighted work." Section 101 defines a derivative work as:

> a work based on one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations or other modifications which, as a whole, represent an original work of authorship is a "derivative work."

To constitute a derivative work, "the infringing work must incorporate in some form a portion of the copyrighted work." *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985). In addition, the infringing work must be substantially similar to the copyrighted work. *Id.*

The 1984 version of RAMKEY contained approximately 30 characters of source code copied from Vault's program. Vault's program contained the equivalent of approximately 50 pages of source code, and the 1984 version of RAMKEY contained the equivalent of approximately 80 pages of source code. By all accounts, the 30 character sequence shared by RAMKEY and Vault's program constituted a quantitatively minor amount of source code. In response to Vault's contention that RAMKEY constitutes a derivative work, the district court found that "the copying in 1984 was not significant" and that "there has been no evidence ... that there has been any further duplication." Holding that "RAMKEY is not a substantially similar copy of PROLOK," the court concluded that "RAMKEY is not a derivative work." *Vault*, 655 F.Supp. at 759.

Vault now contends that the district court, in evaluating the 1984 version of RAMKEY, incorrectly emphasized the *quantity* of copying instead of the *qualitative* significance of the copied material, and cites *Whelan Assoc's., Inc. v. Jaslow Dental Laboratory, Inc.*, 797 F.2d 1222 (3d Cir.1986), *cert. denied*, —— U.S. ——, 107

S.Ct. 877, 93 L.Ed.2d 831 (1987), for the proposition that a "court must make a qualitative, not quantitative, judgment about the character of the work as a whole and the importance of the substantially similar portions of the work." *Id.* at 1245. *See Midway Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009, 1013–14 (7th Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983). The sequence copied, Vault asserts, constituted the identifying portion of Vault's program which interacts with the "fingerprint" to confirm that the original PROLOK diskette is in the computer's disk drive. Vault contends that, because this sequence was crucial to the operation of Vault's program and RAMKEY's ability to defeat its protective function, the copying was qualitatively significant.

The cases upon which Vault relies, *Whelan* and *Midway*, both involved situations where the derivative work performed essentially the same function as the copyrighted work. *Whelan*, 797 F.2d at 1225–26; *Midway*, 704 F.2d at 1010–11.[25] In this case, Vault's program and RAMKEY serve opposing functions; while Vault's program is designed to prevent the duplication of its customers' programs, RAMKEY is designed to facilitate the creation of copies of Vault's customers' programs. Under these circumstances, we agree with the district court that the 1984 copying was not significant and that this version of RAMKEY was not a substantially similar copy of Vault's program.

While Vault acknowledges that the latest version of RAMKEY does not contain a sequence of characters from Vault's program, Vault contends that this version is also a derivative work because it "alters" Vault's program. Vault cites *Midway* for the proposition that a product can be a derivative work where it alters, rather than copies, the copyrighted work. The court in *Midway*, however, held that the sale of a product which speeded-up plaintiff's programs constituted contributory infringement because the speeded-up programs were derivative works. 704 F.2d at 1013–14. The court did not hold, as Vault asserts, that defendant's product itself was a derivative work. We therefore reject Vault's contention that the latest version of RAMKEY constitutes a derivative work.

## IV. Vault's Louisiana Claims

Seeking preliminary and permanent injunctions and damages, Vault's original complaint alleged that Quaid breached its license agreement by decompiling or disassembling Vault's program in violation of the Louisiana Software License Enforcement Act (the "License Act"), La.Rev.Stat. Ann. § 51:1961 *et seq.* (West 1987), and that Quaid misappropriated Vault's program in violation of the Louisiana Uniform Trade Secrets Act, La.Rev.Stat.Ann. § 51:1431 *et seq.* (West 1987). On appeal, Vault abandons its misappropriation claim,[26] and, with respect to its breach of license claim, Vault only seeks an injunction to prevent Quaid from decompiling or disassembling PROLOK version 2.0.[27]

Louisiana's License Act permits a software producer to impose a number of contractual terms upon software purchasers provided that the terms are set forth in a license agreement which comports with La. Rev.Stat.Ann. §§ 51:1963 & 1965, and that this license agreement accompanies the producer's software. Enforceable terms include the prohibition of: (1) any copying of the program for any purpose; and (2) modifying and/or adapting the program in

---

CONTU Report at 31–32 (footnote omitted).

**25.** In *Whelan*, the copyrighted work was a computer program and the derivative work was the same program written in a different computer language. 797 F.2d at 1225–26. In *Midway*, the copyrighted work was a video game and the derivative work was a speeded-up version of that game. *Midway*, 704 F.2d at 1010–11.

**26.** While the district court held that the Louisiana Uniform Trade Secrets Act, La.Rev.Stat. Ann. § 51:1431 *et seq.*, was not preempted by

the Copyright Act, the court held that the process of ascertaining information by "reverse engineering," used by Quaid to analyze the operation of Vault's program, did not constitute a violation of the Louisiana Trade Secrets Act. *Vault*, 655 F.Supp. at 761. This holding is not challenged on appeal.

**27.** Beginning with PROLOK version 2.0, Vault's license agreement contained a choice of law clause adopting Louisiana law. *See supra* note 3.

any way, including adaptation by reverse engineering, decompilation or disassembly. La.Rev.Stat.Ann. § 51:1964.[28] The terms "reverse engineering, decompiling or disassembling" are defined as "any process by which computer software is converted from one form to another form which is more readily understandable to human beings, including without limitation any decoding or decrypting of any computer program which has been encoded or encrypted in any manner." La.Rev.Stat.Ann. § 51:1962(3).

Vault's license agreement, which accompanies PROLOK version 2.0 and comports with the requirements of La.Rev.Stat.Ann. §§ 51:1963 & 1965, provides that "[y]ou may not ... copy, modify, translate, convert to another programming language, decompile or disassemble"[29] Vault's program. Vault asserts that these prohibitions are enforceable under Louisiana's License Act, and specifically seeks an injunction to prevent Quaid from decompiling or disassembling Vault's program.

The district court held that Vault's license agreement was "a contract of adhesion which could only be enforceable if the [Louisiana License Act] is a valid and enforceable statute." *Vault*, 655 F.Supp. at 761. The court noted numerous conflicts between Louisiana's License Act and the Copyright Act, including: (1) while the License Act authorizes a total prohibition on copying, the Copyright Act allows archival copies and copies made as an essential step in the utilization of a computer program, 17 U.S.C. § 117; (2) while the License Act authorizes a perpetual bar against copying, the Copyright Act grants protection against unauthorized copying only for the life of the author plus fifty years, 17 U.S.C. § 302(a); and (3) while the License Act places no restrictions on programs which may be protected, under the Copyright Act, only "original works of authorship" can be protected, 17 U.S.C. § 102. *Vault*, 655 F.Supp. at 762–63. The court concluded that, because Louisiana's License Act "touched upon the area" of federal copyright law, its provisions were preempted and Vault's license agreement was unenforceable. *Id.* at 763.

In *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), the Supreme Court held that "[w]hen state law touches upon the area of [patent or copyright statutes], it is 'familiar doctrine' that the federal policy 'may not be set at naught, or its benefits denied' by the state law." *Id.* at 229, 84 S.Ct. at 787 (quoting *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 176, 63 S.Ct. 172, 173, 87 L.Ed. 165 (1942)). *See Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *see also Mitchell v. Penton/Indus. Publishing*

---

**28.** Section 51:1964 reads, in full:

Terms of which shall be deemed to have been accepted under R.S. 51:1963, if included in an accompanying license agreement which conforms to the provisions of R.S. 51:1965, may include any or all of the following:

(1) Provisions for the retention by the licensor of title to the copy of the computer software.

(2) If title to the copy of computer software has been retained by the licensor, provisions for the prohibition of any copying of the copy of computer software for any purpose and/or limitations on the purposes for which copies of the computer software can be made and/or limitations on the number of copies of the computer software which can be made.

(3) If title to the copy of computer software has been retained by the licensor, provisions for the prohibition or limitation of rights to modify and/or adapt the copy of the computer software in any way, including without limitation prohibitions on translating, reverse engineering, decompiling, disassembling, and/or creating derivative works based on the computer software.

(4) If title to the copy of computer software has been retained by the licensor, provisions for prohibitions on further transfer, assignment, rental, sale, or other disposition of that copy or any other copies made from that copy of the computer software, provided that terms which prohibit the transfer of a copy of computer software in connection with the sale or transfer by operation of law of all or substantially all of the operating assets of a licensee's business shall to that extent only not be deemed to have been accepted under R.S. 51:1963.

(5) Provisions for the automatic termination without notice of the license agreement if any provisions of the license agreement are breached by the licensee.

**29.** *See supra* note 2.

*Co.*, 486 F.Supp. 22 (N.D. Ohio 1979) (holding that common law unfair competition claim preempted by the Copyright Act); *Triangle Publications, Inc. v. Sports Eye, Inc.*, 415 F.Supp. 682, 686–87 (E.D.Penn. 1976) (holding that state regulation of unfair competition preempted as to matters falling within broad confines of the Copyright Act). Section 117 of the Copyright Act permits an owner of a computer program to make an adaptation of that program provided that the adaptation is either "created as an essential step in the utilization of the computer program in conjunction with a machine," § 117(1), or "is for archival purpose only," § 117(2).[30] The provision in Louisiana's License Act, which permits a software producer to prohibit the adaptation of its licensed computer program by decompilation or disassembly, conflicts with the rights of computer program owners under § 117 and clearly "touches upon an area" of federal copyright law. For this reason, and the reasons set forth by the district court, we hold that at least this provision of Louisiana's License Act is preempted by federal law, and thus that the restriction in Vault's license agreement against decompilation or disassembly is unenforceable.

### V. Conclusion

We hold that: (1) Quaid did not infringe Vault's exclusive right to reproduce its program in copies under § 106(1); (2) Quaid's advertisement and sale of RAMKEY does not constitute contributory infringement; (3) RAMKEY does not constitute a derivative work of Vault's program under § 106(2); and (4) the provision in Vault's license agreement, which prohibits the decompilation or disassembly of its program, is unenforceable.

The judgment of the district court is AFFIRMED.

---

30.  *See supra* note 11.