**ADVANCED COMPUTER SERVICES OF MICHIGAN, INC., d/b/a Advanced Computer Services; MGM Associates, Inc., d/b/a Business Systems, Inc.; Data Systems Support, Inc.; Basic System Services, Inc.; React Computer Services, Inc.; Pacific React Services, Inc.; and Total Support Incorporated, Plaintiffs,**

v.

**MAI SYSTEMS CORPORATION, Defendant.**

**MAI SYSTEMS CORPORATION, Counterclaim–Plaintiff,**

v.

**ADVANCED COMPUTER SERVICES OF MICHIGAN, INC., d/b/a Advanced Computer Services; MGM Associates, Inc., d/b/a Business Systems, Inc.; Data Systems Support, Inc.; Basic System Services, Inc.; React Computer Services, Inc.; Pacific React Services, Inc.; Total Support Incorporated; and Tim Peter Francis, an individual, Counterclaim–Defendants.**

Civ. A. No. 93–667–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 3, 1994.

Nathan Vance Holt, Jr., Douglas E. Rosenthal, Douglas B. Rutzen, Grace W. Lawson, Coudert Bros., Washington, DC, Ronald S. Katz, Janet S. Arnold, Coudert Bros., San Francisco, CA, for plaintiffs.

Paul James Kennedy, Kip Schwartz, Graham and James, Washington, DC, Elliott J. Stein, Gen. Counsel, MAI Systems Corp., Irvine, CA, for defendant.

### *MEMORANDUM OPINION*

ELLIS, District Judge.

#### *I.*

Does the act of transferring a copyrighted software program from a computer's hard drive or permanent memory to its random access memory ("RAM") amount to the making of a "copy" under the Copyright Act, 17 U.S.C. § 101 et seq. ("the Act"), so as to constitute infringement of the software copyright?

This important question, undecided in this circuit, is central to the disposition of the summary judgment motions at bar in this copyright and anti-trust action. Many of the other questions raised by the motions depend

significantly on the resolution of this central question.

More specifically, plaintiffs in this case are small independent service organizations ("ISO's"), who allege that defendant MAI, a computer manufacturer and owner of copyrighted software, engaged in illegal tying and monopolization in violation of the Sherman Act §§ 1 and 2, respectively. MAI, in turn, counterclaimed against plaintiffs, alleging, *inter alia*, infringement of its copyrighted software, misappropriation of trade secrets, and several state claims, including tortious interference with business relations.

After extensive discovery, plaintiffs have moved for partial summary judgment on MAI's copyright infringement claim, while MAI has moved for summary judgment on its copyright infringement claim as well as on plaintiffs' Sherman Act claims. This memorandum opinion reflects the Court's disposition of these summary judgment motions.

### II.

MAI is a Delaware corporation with its principal place of business in Irvine, California.[1] Until recently, MAI was engaged in the business of manufacturing and selling various minicomputers, including the Mpx and Spx model series ("MAI computers"). In addition, MAI has always been, and continues to be, engaged in the business of maintaining and servicing its computers. The worldwide market for service and maintenance of MAI computers produces revenues in excess of $50 million dollars per year. Approximately 90% of this market is controlled by MAI, while plaintiffs, seven relatively small independent service organizations who have competed in this market for

years, collectively share most of the remaining 10% of the market.[2]

In April 1993, MAI filed for bankruptcy protection and reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* A month later, on May 20, 1993, plaintiffs filed their three-count anti-trust complaint in this case, asserting (1) *per se* tying, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, (2) rule of reason tying, in violation of the same statute, and (3) monopolization, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

Plaintiffs' anti-trust allegations are based on the following facts, which MAI does not dispute. MAI computers are unique; their parts and operating system software do not work in other manufacturers' minicomputers. Purchasing MAI computers requires a substantial financial investment. With proper maintenance and service, a new MAI system has a useful service life of at least five (5) years. Because special training is required to maintain MAI systems, purchasers of MAI computers have limited choices in selecting a maintenance and service firm; they must select either MAI or another firm, including any of plaintiffs, that specializes in the servicing and maintenance of MAI computers. Firms without the technical training or skill in maintenance and service of MAI computers or without an inventory of MAI parts cannot adequately meet the maintenance and service needs of MAI computer owners.

On April 29, 1993, MAI sent a "cease and desist" letter to plaintiffs and other independent service organizations. This letter cited *MAI Sys. Corp. v. Peak Computer,* 991 F.2d 511 (9th Cir.1993), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994), a decision favorable to MAI,[3] and demanded

---

1. A summary of the facts in this case can also be found in *Advanced Computer Serv. of Michigan v. MAI Systems Corp.,* 161 B.R. 771, 771–73 (E.D.Va.1993), an earlier opinion in this case concerning the effect of the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362.

2. These market share figures appear in the complaint. MAI disputes these figures, claiming instead that its market share is less than 50%. This factual dispute is not material to the disposition of the issues at bar.

3. In *Peak,* MAI sued Peak Computer, Inc., an independent service organization that provided maintenance and repair services to MAI computer owners. Specifically, MAI asserted copyright infringement claims against Peak for alleged unauthorized use of MAI's software in the course of providing hardware maintenance services to owners of MAI computers. The Ninth Circuit, *inter alia,* held that a computer service company engaged in unlawful copying when it loaded copyrighted software into a computer's random access memory. *Peak,* 991 F.2d at 517–19.

that all independent service organizations immediately cease and desist from any activity involving copying of MAI's operating system software, including loading or booting the software.

Based on the facts alleged, plaintiffs contend that MAI is unlawfully tying the sale of its copyrighted operating system and diagnostic software (the tying product) to the sale of maintenance and repair services for its computers (the tied product). Plaintiffs further allege that MAI is exploiting the complete market power it enjoys over the sale of its copyrighted software to distort and preclude competition in the tied product market, namely the market for maintenance and repair services for MAI computers. This tying arrangement, according to plaintiffs, (i) "has harmed and is harming competition in the market for the tied product" and (ii) "has foreclosed and is foreclosing a substantial volume of commerce in the market for the tied product." Plaintiffs also claim that MAI's tying arrangement "has caused and is causing injury to both buyers and sellers in the market." Plaintiffs finally claim that they have lost, and are continuing to lose, profits as a result of the tying arrangement, which they contend is both a *per se* and a rule of reason violation of § 1 of the Sherman Act, as well as an abuse of market power amounting to monopolization under § 2 of the Sherman Act. In sum, the thrust of the complaint is that MAI is impermissibly using its copyrights to preclude competition in MAI computer maintenance and repair.

MAI answered by denying the complaint's legal claims. But more than this, MAI also filed a six-count counterclaim, the thrust of which is that plaintiffs' efforts to compete in the MAI computer service and repair market really amount to an infringement of MAI's software copyrights, misappropriation of MAI's trade secrets, interference with MAI's business relations with its present and prospective customers, and infringement of MAI's trademarks. Counterclaim relief sought by MAI includes compensatory and punitive damages, as well as injunctive and declaratory relief.

At the heart of this litigation is MAI's software. In the process of developing its computer systems, MAI developed two types of unique software: (1) operating system software designed to provide the basic commands to operate MAI computers and (2) diagnostic software. The operating system software, which contains utilities programs and some diagnostic programs, is integrated into the computer. Perhaps the most important diagnostic feature built into the operating system software for the purposes of this litigation is the "error log." This feature serves as a first indication of a malfunction in the computer hardware and may direct a technician to the source of the problem. The diagnostic stand-alone software provides more detailed and specified instructions regarding identifying and solving computer malfunctions. Both types of this unique software enjoy federal copyright protection.[4]

Because MAI licenses, but does not sell, this software, its authorized use is limited to MAI and MAI's licensees. Significantly, MAI contends that "loading" or "booting" the operating system software constitutes the creation of a "copy" and therefore that the process of unauthorized loading or booting of the software, including loading and use by the plaintiffs, who are unlicensed, constitutes a violation of the Copyright Act.

"Loading" or "booting" the software entails a transfer of the software program from a storage device such as a hard disk or floppy disk into the random access memory ("RAM") of the computer. This loading can occur in various ways, depending upon the type of software and upon the model of MAI computer used. In at least one MAI model this "loading" occurs automatically when the computer is turned on. In other models, users typically must take an additional step, such as pressing a "load" button. Similarly, access to the stand-alone diagnostic software requires the physical insertion of a disk containing the program into the computer. Regardless of the means of loading, none of the programs can communicate with the computer unless they are first loaded into RAM.

MAI contends that plaintiffs infringed on its copyrights in three distinct ways: (1)

---

**4.** MAI identifies seven copyright registrations applicable to the operating system software.

direct infringement of its software copyrights, (2) contributory copyright infringement, and (3) infringement through the wrongful distribution of MAI software in conjunction with the sale of used MAI hardware. Of these claims, only the first two are the subject of summary judgment. With respect to these claims of direct infringement, the record reflects the following. Direct infringement arises in two contexts: plaintiffs' use of MAI software at their own office locations and plaintiffs' use of MAI software at customer sites. It is undisputed that all plaintiffs, except for DSSI, have MAI computers at their offices and use MAI's copyrighted operating system software in their machines without having obtained a license or any other permission from MAI.[5] This software is then used either to aid in the servicing of customers' computers, to help train new employees in the service of MAI software, or to help plaintiffs generate their own software programs. It is also undisputed that field technicians of each plaintiff used MAI's operating system software and standalone diagnostic software in the course of servicing customers' computers. Field technicians employed by each of the plaintiffs admit that they routinely loaded and ran MAI's operating system software in the course of servicing customers' computers and that such access included use of the various diagnostic and utilities contained therein, including frequent references to the "error log." Plaintiffs' field technicians also routinely reload the operating system software after performing maintenance services to determine if their repairs have been effective. In addition, MAI's stand-alone diagnostic software has been loaded and run by field technicians employed by each plaintiff in the course of servicing customers' computers at customers' sites.

With respect to MAI's contributory infringement claim, the record reflects that field technicians employed by each of the plaintiffs admit they have loaded and used

MAI software at customer sites. MAI claims that, by inducing customers to allow this access, plaintiffs induced MAI customers to violate their license agreements.[6]

### III.

■ Under Rule 56(c), Fed.R.Civ.P., summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Material facts are those facts whose determination will affect the outcome of a suit, and an issue of material fact is considered genuine if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Further, disposition by summary judgment is appropriate when the evidence, taken as a whole and viewed in the light most favorable to the party opposing the motion, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In this regard, the moving party has the burden of showing the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). This burden necessarily implicates the evidentiary standard of proof that would apply at the trial on the merits:

"If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, ... [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find

**5.** A partial exception to this statement is plaintiff React Computer Services, Inc., which obtained a license for only two of the four MAI systems at its corporate facilities. The remaining plaintiffs, BSSI, BSI, ACS, TSI, and Pacific React, do not have licensing agreements for any of the operating system software in their possession.

**6.** The operating system license agreements uniformly provide that the licensee shall not make the software "available to others."

by a preponderance of the evidence that the plaintiff is entitled to a verdict...."

*Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

In sum, it follows that "summary judgments should be granted in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Miller v. Federal Deposit Ins. Corp.,* 906 F.2d 972, 973 (4th Cir.1990). It is through the lens of these principles that the claims and the record must be examined.

## IV.

■ Analysis of the case at bar properly begins with the central issue involved: copyright infringement. And the starting point for the summary judgment analysis of this issue is to state the elements of copyright infringement. To prevail on a copyright infringement claim, a plaintiff must establish two elements: (1) ownership of a valid copyright and (2) copying by the defendant. *See Keeler Brass Co. v. Continental Brass Co.,* 862 F.2d 1063 (4th Cir.1988); *Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607, 614 (7th Cir. 1982), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982).

■ The first element is not genuinely in dispute.[7] The second element—unauthorized copying—is the heart of copyright infringement and the principal dispute between the parties on this claim. This dispute, more precisely, is whether the transfer of a computer program from a storage device, whether an external disk or an internal hard disk, to a computer's RAM constitutes a copy for purposes of copyright law. Plaintiffs' argument is simply that the nature of RAM is inherently so ephemeral, so transitory, as to preclude a finding that a "copy" of the program is made when it is transferred from a permanent memory source to the computer's RAM. MAI responds that transferring a program to RAM memory falls squarely within the Act's definition of making a "copy."

Under the Act, "copies" are defined as:

material objects ... in which a work is fixed by any method now known or later developed and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

17 U.S.C. § 101. And the Act further explains what is meant by "fixed":

A work is "fixed in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

17 U.S.C. § 101. Given these definitions, an understanding of the nature of RAM memory is central to determining whether the entry of a program into RAM constitutes a "copy" under the Act.

The RAM in MAI computers is composed of dynamic random access memory chips ("DRAMs") and static random access memory chips ("SRAMs"), with DRAMs predominating. DRAMs are "dynamic" because they must be repeatedly "refreshed" with an electrical charge or they will lose the information stored within them. SRAMs do not require such refreshing. Both DRAMs and SRAMs, however, quickly lose their information when electrical power is removed. Thus, they are volatile, and for this reason are often termed "volatile memory," in contrast with ROM, the contents of which are semi-permanent.

Although the contents of RAM are, in some respects, ephemeral or transient, it is

---

**7.** It is undisputed that MAI secured certificates of copyright registration for each of the operating system and diagnostic software involved. These certificates of registration constitute *"prima facie* evidence ... of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Plaintiffs resist this conclusion, contending that the certificates do not provide *prima facie* evidence of the validity of MAI's copyrights because two of the registrations were allegedly not timely filed. This allegation is not supported by evidence. Instead, it appears the plaintiffs have confused the date of creation listed on the Certificates with the date of publication, which occurred later. As a consequence, plaintiffs have not rebutted the statutory presumption of validity that arises from copyright registration. *See, e.g., M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 424 (4th Cir.1986).

important to remember that the Act does not require absolute permanence for the creation of a copy. Rather, the Act requires only that the representation created in RAM be a "material object" that is "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101. Plaintiffs contend that the transfer of a computer program into RAM fails to meet even this standard. First, they contend that a program in RAM is not a "material object," but is instead merely a collection of positive and negative charges. This argument fails in the face of the Act's 1980 amendments. These amendments unambiguously extended copyright protection to computer programs. Pub.L. 96–517, Sec. 10, 94 Stat. 3028 (1980) (Codified at 17 U.S.C. §§ 101, 117). Specifically, the Act, as amended, extends protection to all original works "which ... can be perceived, reproduced, or otherwise communicated, either directly *or with the aid of a machine or device.*" 17 U.S.C. § 102(a) (emphasis added). This language supports a reading of the Act that recognizes that electrical impulses of a program in RAM are material objects,[8] which, although themselves imperceptible to the ordinary observer, can be perceived by persons with the aid of a computer.

Beyond materiality is the question whether the program, in the form of electrical impulses in RAM, is adequately "fixed" to qualify as a "copy" for purposes of the Act. Plaintiffs argue that, because a program in RAM is only captured momentarily in the memory of a computer, it is too transient and ephemeral to meet the Act's requirements for "fixation." This argument, too, fails. Once a software program is loaded into a computer's RAM, useful representations of the program's information or intelligence can be displayed on a video screen or printed out on a printer. And this can be done virtually instantaneously once loading is completed. Given this, it is apparent that a software program residing in RAM is "stable enough to be perceived, reproduced, or otherwise

communicated for a period of more than transitory duration." 17 U.S.C. § 101.

Interestingly, this conclusion is actually confirmed rather than refuted by plaintiffs' argument that the RAM representation of the program is not "fixed" because it disappears from RAM the instant the computer is turned off. Thus, one need only imagine a scenario where the computer, with the program loaded into RAM, is left on for extended periods of time, say months or years, or indeed left on for the life of the computer. In this event, the RAM version of the program is surely not ephemeral or transient; it is, instead, essentially permanent and thus plainly sufficiently fixed to constitute a copy under the Act. Of course, if a computer is turned off within seconds or fractions of a second of the loading, the resulting RAM representation of the program arguably would be too ephemeral to be considered "fixed" or a "copy" under the Act. It is unnecessary here to decide precisely where along the time continuum the line should be drawn between RAM representations of a program that are of a sufficient duration to be "fixed" and those that are not. MAI's copyright infringement claim is not aimed at situations where the power to the computer is turned off and the RAM erased within a second of the completion of loading. Instead, MAI's attack focuses on those situations where the computer is left on for a time measured in minutes, if not longer. And the existing factual record clearly reflects that such situations occur at plaintiffs' business locations where plaintiffs use MAI hardware and software and at plaintiffs' customers' business locations, where plaintiffs' technicians service and repair their customers' MAI computers. In sum, where, as here, a copyrighted program is loaded into RAM and maintained there for minutes or longer, the RAM representation of the program is sufficiently "fixed" to constitute a "copy" under the Act.

This conclusion finds support in several decisions, most notably *MAI Sys. Corp. v.*

---

**8.** To visualize the materiality of a program in RAM, one need only consider the fact that a program in RAM takes up RAM space. RAM is not infinite in capacity; the process of loading a program into RAM reduces the amount of available space in RAM to be used for other programs or information.

*Peak Computer,* 991 F.2d 511 (9th Cir.1993).[9] In *Peak,* the Ninth Circuit faced facts essentially similar to those presented here. Peak, like plaintiffs, is a third-party maintenance company which services MAI computer systems owned by MAI's software licensees. In connection with its maintenance services, Peak loaded and ran MAI's software programs without a license of its own and outside the restrictive scope of the license agreements between MAI and Peak's customers. There, as here, MAI claimed copyright infringement. The Ninth Circuit affirmed summary judgment in MAI's favor on the infringement claim. In reaching this result, the Ninth Circuit panel rejected the same argument plaintiffs advance here, namely that loading of copyrighted software into RAM did not constitute a "copy" because the RAM version of the program is not sufficiently "fixed." *Id.* at 518. The panel reasoned that Peak's ability to review the operating system software's "error log" to diagnose the computer problem demonstrated that the representation created in RAM was sufficiently fixed. *Id.* The same reasoning is persuasive here.

Finally, plaintiffs argue that "copying" is a term of art in the computer industry that does not encompass loading a program into RAM, and hence cannot constitute copyright infringement. In support, plaintiffs point to MAI's own licensing agreement, which prohibits licensees from "copying" MAI's licensed software. Therefore, MAI asserts, loading cannot equal "copying," for otherwise MAI's licensees would violate their license agreements every time they load their software into RAM. The fatal flaw in this argument is that "copy" and "copying" are defined by the Act, not by license agreements or industry usage. And the Act's definitions do not exclude RAM loading.

Because MAI's software programs enjoy copyright protection and because the record facts establish that plaintiffs copied these programs by loading them into RAM, infringement is established unless plaintiffs' asserted defenses are valid. Next, therefore, it is necessary to assess plaintiffs' asserted defenses: (1) fair use and (2) misuse.

## V.

Fair use is an "equitable rule of reason," allowing courts to find certain uses noninfringing where such uses benefit the public and further the overall purpose of the Copyright Act. *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 448 & n. 31, 104 S.Ct. 774, 792 & n. 31, 78 L.Ed.2d 574 (1984); *Triangle Publications, Inc. v. Knight–Ridder Newspapers, Inc.,* 626 F.2d 1171, 1174 (5th Cir.1980). The rationale for the fair use doctrine is that, when the free flow of information is sufficiently vital, it should override the copyright holder's interest in the exclusive control of the work. *See Hustler Magazine, Inc. v. Moral Majority, Inc.,* 796 F.2d 1148, 1151–52 (9th Cir.1986). Consistent with this rationale, four statutory factors must be considered in evaluating whether fair use exists. They are:

(1) The purpose and character of the use, including whether such use is of a commercial nature ...;

(2) The nature of the copyrighted work;

9. For other cases supporting the view that a RAM version of a program is sufficiently fixed to qualify for copyright protection, see *Vault Corp. v. Quaid Software, Ltd.,* 847 F.2d 255, 260 (5th Cir.1988) ("the act of loading a program from a medium of storage into a computer's memory constitutes a copy of the program"); *ISC–Bunker Ramo Corp. v. Altech, Inc.,* 765 F.Supp. 1310 (N.D.Ill.1990) (holding that loading a computer's memory requires copying of the program and that such a copy constitutes infringement); *Apple Computer, Inc. v. Formula International, Inc.,* 562 F.Supp. 775 (C.D.Cal.1983), *aff'd* 725 F.2d 521 (9th Cir.1984) (copying from a diskette into RAM memory is a copy); *Micro–Sparc, Inc. v. Amtype Corp.,* 592 F.Supp. 33, 35 (D.Mass.1984) (holding that inputting a program into memory constitutes a copy).

It is worth noting that the sole case cited by plaintiffs for the proposition that the transfer of a program into RAM does not constitute a copy is not directly on point. *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.,* 780 F.Supp. 1283, 1289 (N.D.Cal.1991), *aff'd* 964 F.2d 965 (9th Cir.1992); *cert. denied* —— U.S. ——, 113 S.Ct. 1582, 123 L.Ed.2d 149 (1993), held that a consumer's modification of copyrighted material for noncommercial, private enjoyment did not constitute a derivative work for purposes of copyright law. *Galoob* focuses on the doctrine of fair use and does not hold that a RAM copy is insufficiently fixed to constitute a copy under the Act.

(3) The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) The effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

■ The purpose and character of plaintiffs' use weighs against a finding of fair use. Plaintiffs admit that the sole purpose of their use of MAI's copyrighted software is in connection with the provision of computer maintenance services. This is a commercial use and the Supreme Court has held that "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the holder of the copyright." *Sony,* 464 U.S. at 451, 104 S.Ct. at 793.[10] Factor (1), therefore, weighs substantially against a finding of fair use by plaintiffs.

To counter this conclusion, plaintiffs raise a "public benefit" argument, contending that MAI customers, at the time they purchased MAI computers, expected to be able to use third party ISO's, such as plaintiffs, to service their computers. Plaintiffs argue that these customers might not have purchased MAI computers had they known that less expensive ISO servicing would not be an option and that they would be forced to pay the higher rates charged by MAI for servicing their computers. To be sure, courts should "consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially." *Sega Enterprises, Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1523 (9th Cir.1992). This public benefit, however, typically involves "the development of art, science, and industry," *Rosemont Enters. v. Random House, Inc.,* 366 F.2d 303, 307 (2nd Cir.1966), *cert. denied* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967) (citations omitted), and not, as here, the purely financial interests of

customers. In any event, MAI customers, having signed license agreements, were on notice that they could not allow third parties to use the software. They were not misled. Moreover, MAI's higher service rates cannot be said to violate the public interest because MAI should be entitled to rely on service fees to recoup its investment costs in developing the software.

The second factor, the software's nature, also militates against a fair use finding. The scope of fair use is greater when the purpose or character of the work is "informational," "functional," or "factual," rather than "creative." *Sega,* 977 F.2d at 1524; *Moral Majority,* 796 F.2d at 1152–54; *N.A.D.A. Services Corp. v. Business Data of Virginia, Inc.,* 651 F.Supp. 44, 48 (E.D.Va.1986). In addition, courts may consider whether the copyrighted work "represent[s] a substantial investment of time and labor made in anticipation or a financial return." *See MCA, Inc. v. Wilson,* 677 F.2d 180, 182 (2nd Cir.1981); *Wainwright Secur., Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 96 (2nd Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978); *Allen–Myland, Inc. v. International Business Machines Corp.,* 746 F.Supp. 520, 534 (E.D.Pa.1990). As a whole, MAI's software, although used for a functional purpose, is essentially a creative work. It is not a mere compilation of existing information; it is instead a specially designed and crafted work which represents a substantial investment of time and labor.[11]

■ The extent of the copying is the third factor to evaluate in the fair use analysis. This is usually a matter of degree. Copying an entire work weighs against a finding of fair use. *McGowan* [991 F.2d 790 (table) ], 1993 U.S. App. LEXIS at *4 and *5. But it is not necessary to copy the entire work before this factor will weigh against finding fair use. A finding against fair use is

---

**10.** Similarly, the Fourth Circuit has stated that "the crux of the profit/nonprofit distinction is ... whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *McGowan v. Cross,* [991 F.2d 790 (table) ] No. 92–1480, 1993 U.S. App. LEXIS 9134 at *4 and *5 (4th Cir.1993) (citing *Harper & Row Publishers v. Nation Enterprises,*

471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985)).

**11.** While the amount MAI spent in developing its software may be disputed, there is no doubt that MAI's expense was substantial. As a consequence, this is not a factual dispute that stands in the way of summary judgment.

warranted even when only a portion of the copyrighted work is copied, provided the copied portion is a key or essential part of the work. *Allen–Myland,* 746 F.Supp. at 534–44. Nor does whole copying preclude a finding of fair use. *See Sony,* 464 U.S. at 449–50, 104 S.Ct. at 792; *N.A.D.A.,* 651 F.Supp. at 48. In the instant case, plaintiffs' field technicians regularly load MAI software in its entirety into RAM, thus copying the work as a whole. Furthermore, it is uncontested that plaintiffs loaded and used the operating system software's diagnostic functions, including the "error log," as well as the standalone software's diagnostic functions, which are the heart of the software's copyrighted material. Consequently, the extent and substantiality of plaintiffs' use weighs against a finding of fair use.[12]

Finally, the effect of plaintiffs' use of MAI software on the market for MAI's copyrighted work must be examined. It is generally held that a use that does not materially impair the marketability of the copyrighted work will be deemed fair. *See Sony,* 464 U.S. at 450, 104 S.Ct. at 792; *Harper v. Row,* 471 U.S. at 566–67, 105 S.Ct. at 2234; *N.A.D.A.,* 651 F.Supp. at 48. Because plaintiffs' copying of the MAI software was commercial in nature, however, the likelihood of future harm to the potential market for or to the value of the software may be presumed. *Sony,* 464 U.S. at 451, 104 S.Ct. at 793; *Allen–Myland,* 746 F.Supp. at 535. Plaintiffs contend their use of MAI's copyrighted software has no adverse impact upon the market for such software. If anything, plaintiffs argue, their use of MAI's software enhances the value of the software since MAI would lose business in the sale of MAI computers if customers could not use ISO's to service their MAI equipment. This argument reflects a confusion as to the appropriate relevant market, which is the market for licensing MAI's copyrighted software, not the market for selling MAI computers. Plaintiffs' unauthorized use of MAI's copyrighted software clearly deprives MAI of license fees associated with the use of their software. *See Richard Anderson Photography v. Brown,* No. 85–0373–R, 1990 U.S. Dist. LEXIS 19846 at *2–*3 (W.D.Va.1990) (holding that activities by alleged infringers that deny a copyright holder licensing fees clearly affect the value of the copyrighted work).[13]

In sum, an evaluation of the four statutory factors in the context of this case points convincingly against a finding of fair use.

### VI.

The copyright misuse defense arises out of *Lasercomb America, Inc. v. Reynolds,* 911 F.2d 970, 978 (4th Cir.1990), which held that a copyright owner may not enforce its copyright to violate the antitrust laws or indeed use it in any "manner violative of the public policy embodied in the grant of a copyright." *Id.* at 978. Plaintiffs allege that MAI has misused its copyrights in two ways: First, by using its copyrights to violate anti-

---

12. Plaintiffs' reliance on *Sega,* 977 F.2d at 1510, on this point is not persuasive. That case is factually inapposite. There, unlike here, "[the infringer] copied Sega's software *solely* in order to discover the functional requirements for compatibility with the Genesis-console—aspects of Sega's programs that are not protected by copyright." *Sega,* 977 F.2d at 1522. Also, "[the infringer] did not seek to avoid paying the customarily charged fee for use of these [software interface] procedures, nor did it simply copy Sega's code; rather, *it wrote its own procedures* based upon what it had learned throughout disassembly." *Id.*

Thus, the proposition established in *Sega* is that disassembly of software is permitted to examine the functional requirements for compatibility because these functional elements were not protected by copyright. Here, plaintiffs did not just copy a limited portion of MAI's software for some purpose related to understanding a function not protected by copyright. Instead, they repeatedly used MAI's programs to avail themselves of the copyrighted matter provided in the software.

13. Furthermore, MAI asserts that plaintiffs' activities have induced their customers to not enter into licensing agreements with MAI for the diagnostic stand-alone software. Although this assertion is clearly a matter of fact, there is no need to reach it here because plaintiffs have failed to rebut the presumption that their infringement interferes with MAI's market for its copyrighted software.

It is worth noting that even if the plaintiffs' actions did not interfere with the market for MAI software, a finding of fair use would still be unwarranted because the other factors all weigh convincingly against such a finding.

trust laws, and second, by using its copyrights to prevent plaintiffs from performing the normal maintenance of MAI computers, which, plaintiffs claim, violates public policy. Because plaintiffs' antitrust allegations, analyzed in the next section, fail, their copyright misuse defense on this basis also fails. Plaintiffs' public policy basis for a misuse defense fares no better. MAI's licenses are in sharp contrast to those at issue in *Lasercomb.* Specifically, the licenses in *Lasercomb* included restrictions designed to prevent the alleged infringer from developing competing software. No such restrictions are found in MAI's licenses. Nor is it contrary to public policy that MAI charges higher servicing fees than plaintiffs. MAI made an investment in the development of its diagnostic software, which it may legitimately seek to recoup through licensing fees. For all these reasons, plaintiffs' claim of copyright misuse must fail.

Because neither defense of fair use or copyright misuse is successful here, plaintiffs' loading of MAI's protected software into computer RAM, on the record presented, constitutes copyright infringement. Specifically, plaintiffs directly infringe MAI's copyrights by loading and running MAI software on machines at their respective facilities for the purpose of servicing customers' computers. Similarly, plaintiffs also directly infringe MAI's copyrights by loading MAI software into RAM at customer sites.

 Contributory infringement also occurred when plaintiffs induced their customers to allow them access to MAI software. This action led MAI software licensees to violate their licensing agreements, which prohibit the licensees from allowing third parties access to the software. Plaintiffs challenge this assertion by arguing, correctly, that to establish contributory infringement, an underlying act of infringement must be found. Plaintiffs contend that no underlying act of infringement occurred because MAI's software licensees were entitled to allow plaintiffs access to the software under Section 117 of the Copyright Act. But this argument

cannot succeed because Section 117 only permits *"the owner . . . of a computer program to make or otherwise authorize the making of another copy"* without infringing the copyright if it is "an essential step in the utilization of the computer program." 17 U.S.C. § 117 (emphasis added). And MAI customers are not "owners" of the copyrighted software; they possess only the limited rights set forth in their license agreements. Moreover, the license agreements clearly prohibit licensees from allowing third party access to the software. Thus, by permitting third party access to the software, MAI licensees violate their licensing agreements and thereby infringe the copyrights. *See S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1087 (9th Cir. 1989) (holding that licensee infringed owner's copyright when licensee's use exceeded scope of license). It follows, therefore, that plaintiffs' inducement of MAI licensees to violate their licensing agreements constitutes contributory infringement.

*VII.*

### A. The Section 1 "Tying" Claim

 Stated simply, a tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product. . . ." *Northern P.R. Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 519, 2 L.Ed.2d 545 (1958) (footnote omitted); *see also Southern Pines Chrysler–Plymouth, Inc. v. Chrysler Corp.,* 826 F.2d 1360, 1363 n. 4 (4th Cir.1987). The evil of tying "lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of the tied product." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). The tied product market is thereby distorted.[14] Four essential elements must be established to prove an illegal tying arrangement under either a *per se* or rule of reason theory. They are:

(1) The existence of two separate products;

14. For a concise, lucid description of tying, see JOHN H. SHENEFIELD & IRWIN M. STELZER, THE ANTI-TRUST LAWS: A PRIMER 70–73 (1993).

(2) An agreement conditioning purchase of the tying product upon purchase of the tied product or upon agreement not to purchase;

(3) Seller's possession of sufficient economic power in tying product market to restrain competition in tied product market; and

(4) A not insubstantial impact on interstate commerce.

*Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 683 (4th Cir.1992) (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12–16, 18–21, 104 S.Ct. 1551, 1558–60, 1561–63, 80 L.Ed.2d 2 (1984)). In order to prevail against MAI's request for summary judgment on plaintiffs' tying claim, plaintiffs must show that a genuine issue of material fact exists as to the presence of each of these four elements. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Put another way, summary judgment against plaintiffs is warranted if the record reflects no dispute of fact concerning the absence of any of the four requirements.

The first requirement is met; it is clear that two separate products are involved here: (i) MAI software and (ii) repair services for MAI computer equipment. The determination whether one or two products exist centers on the "character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19, 104 S.Ct. at 1562. Specifically, the question is "whether there is 'sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the tied product] separately from [the tying product].'" *Service & Training*, 963 F.2d at 684 (quoting *Jefferson Parish*, 466 U.S. at 21–22, 104 S.Ct. at 1563). In the instant case, the demand for MAI equipment repair services is distinct from the market for MAI software. Confirming this is plaintiffs' concession that they are able to repair MAI computers without accessing MAI software. Moreover, an owner of MAI comput-

ers could hire technicians for the express purpose of servicing its MAI machines. As an employee of the MAI customer, this technician would have legitimate access to the MAI software under the customer's licensing agreement. And it is evident that competition for these employment opportunities, as well as the customers' demand for these services, exists separately from any demand for MAI's copyrighted software.

■ Although the first illegal tying requirement is met, plaintiffs' tying claim falters on the second element. There are, to begin, no explicit agreements conditioning the purchase from MAI of rights to use the software upon the purchase of computer maintenance or repair services from MAI. Plaintiffs have offered no evidence that MAI's license agreement with its customers conditions the licensing of MAI operating system software upon the purchase of MAI's computer maintenance services. To the contrary, purchasers of MAI computers are free to purchase computer servicing from whomever they choose.[15] Instead, the problem faced by plaintiffs is that many of these customers choose to have their computers serviced by firms that have invested the time and money to develop diagnostic software to aid in the servicing process. Customers are free to make this choice, just as plaintiffs are free to develop their own diagnostic software, should they so choose.

■ But the analysis does not end here, for "[i]n the absence of an explicit agreement requiring the purchase as a condition of the sale, courts will accept proof suggesting any kind of coercion by the seller or unwillingness to take the second product by the buyer." J. Shenefield & I. Stelzer, The Antitrust Laws: A Primer 72 (1993). Yet, here, too, there is no evidence of any conduct or tacit agreement from which conditioning could be inferred. All the record reflects is MAI's decision to license selectively, rather than sell, its copyrighted software. This is not evidence of an illegal tying agreement. It is within MAI's discretion to protect its copyrighted works, and this discretion in-

---

**15.** And, in fact, at least ten percent of MAI computer purchasers have done so, by obtaining maintenance and repair services from plaintiffs.

cludes the right to license its software to whomever it chooses. *See Service & Training;* 963 F.2d at 686. Such selective licensing, even if it affects the ability of competitors to provide repair services, does not constitute evidence of an express, or even implied, tying agreement. Especially noteworthy on this point is *Service & Training, Inc. v. Data General Corp.,* 963 F.2d 680 (4th Cir.1992). There, the plaintiff alleged that Data General had tied the purchase of diagnostic software to hardware servicing. In finding that no tying agreement existed, the Fourth Circuit noted that Data General had advised potential customers that only Data General was authorized to use the diagnostic software, that in fact customers had demanded that any provider of repair and maintenance services have access to the diagnostic software, and that customers had not purchased services from third-party ISO's who lacked access to this software. On these facts, the Fourth Circuit found that this evidence was

> entirely consistent with a conclusion that Data General lawfully extolled the superiority of its repair service due to its use of [its diagnostic software] and that customers independently concluded that they preferred Data General Services using [the software] over [third-party ISO's] that do not use [the software].

*Service & Training,* 963 F.2d at 687. The same result obtains here for the same reasons.

Because plaintiffs cannot show that the licensing of MAI software was expressly or implicitly conditioned upon the purchase of MAI computer equipment servicing, they fail to raise a genuine issue of material fact regarding the presence of a tying arrangement. Accordingly, plaintiffs cannot maintain a *per se* or rule of reason tying claim.[16]

### B. *The Section 2 "Monopolization" Claim*

A finding of monopolization in violation of 2 of the Sherman Act is based upon three elements: (1) a specific intent to monopolize the relevant market; (2) predatory or anticompetitive acts in furtherance of intent; and (3) dangerous probability of success. *M & M Medical Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.,* 981 F.2d 160, 166 (4th Cir.1992) (citing *Abcor Corp. v. AM Int'l Co.,* 916 F.2d 924, 926 (4th Cir.1990)). To prevent the entry of summary judgment, plaintiffs must establish a genuine issue of material fact that MAI possessed monopoly power in the relevant market and that MAI willfully acquired or maintained that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident. *Id.* at 163–64.

Courts have long used market share as a principal indicator of market power and as an indication that a monopolizer has a dangerous probability of success. Generally, market share of more than fifty percent is adequate to establish a "dangerous probability of success." *See, e.g., Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,* 917 F.2d 1413, 1443 (6th Cir.1990), *cert. denied* —— U.S. ——, 112 S.Ct. 51, 116 L.Ed.2d 29 (1991). At issue here is the service market for MAI computers. Plaintiffs have introduced evidence that MAI's share of this market is more than 90 percent. MAI disputes this evidence, claiming that its trial evidence would establish that its market share is actually less than 50%. There is, therefore, a triable issue of fact on this element of plaintiffs' § 2 claim.

**16.** Plaintiffs rely heavily on the Supreme Court's recent ruling in *Eastman Kodak Co. v. Image Technical Services, Inc.,* —— U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), as support for their tying and monopolization claims. This reliance is unwarranted, for *Kodak* is easily distinguishable from the case at bar. There, Kodak had a policy whereby replacement parts for Kodak equipment were sold only to buyers of Kodak equipment who used Kodak service or repaired their own machines without the aid of third party ISO's. As part of this policy, Kodak also entered into an express agreement with independent original-equipment manufacturers (OEMs) under which the OEMs would not sell parts for Kodak equipment to anyone other than Kodak. Kodak also pressured Kodak equipment owners and independent parts distributors not to sell Kodak parts to the ISO's.

On these facts, the Supreme Court found a tying arrangement whereby Kodak tied the sale of parts for Kodak machines to the sale of maintenance and repair services. In *Kodak,* however, unlike the case at bar, there were both express and implied agreements conditioning the sale of the tied product to the tying product.

■ But this does not end the matter; there are two elements of § 2 monopolization, and plaintiffs must present enough evidence to create triable issues of fact as to both. Thus, even though market power is disputed, plaintiffs cannot avoid summary judgment on the § 2 claim unless they present evidence creating a triable issue of fact that MAI has engaged in predatory or anticompetitive acts with a specific intent to monopolize the relevant market. It is at this point that plaintiffs' claim falls short because they attempt to establish these facts through a claim of copyright misuse. Specifically, plaintiffs assert that MAI's requirement that plaintiffs refrain from loading MAI's · copyrighted software constitutes an attempt to monopolize the MAI computer service market. In support, plaintiffs cite *Lasercomb America, Inc. v. Reynolds,* 911 F.2d 970, 978 (4th Cir.1990). But, as previously discussed, *Lasercomb* is distinguishable from the present case. In *Lasercomb,* the Fourth Circuit recognized that, while the copyright holder had the right to protect its software, the copyright holder's "standard licensing agreement ... goes much further and essentially attempts to suppress any attempt by the licensee to independently implement the idea which [the software] expresses." *Id.* at 978. Thus, Lasercomb was found to have misused its copyright because it attempted "to control competition in an area outside of its copyright...." *Id.* at 979.

Here, by contrast, MAI has not incorporated overbroad noncompetition clauses in its licensing agreements. Nor does MAI attempt to exceed legally authorized limitations placed on MAI's licensees as to their use of MAI copyrighted software. Rather, MAI is simply attempting to protect the rights accruing to it as the holder of valid copyrights in its software.[17] For the reasons already set forth in this opinion, plaintiffs' loading of MAI software constitutes copyright infringement and, as a consequence, MAI is legally entitled to enforce its copyrights and prevent such infringement. Therefore, MAI's enforcement of its copyrights does not constitute copyright misuse, nor does it constitute anticompetitive conduct in violation of § 2 of the Sherman Act.

## VIII.

The final summary judgment issue to be addressed is MAI's claim that plaintiffs have misappropriated MAI's trade secrets. Specifically, MAI charges plaintiffs with misappropriating MAI's customer database, customer lists, Field Information Bulletins ("FIBs"), internal service handbooks, and computer software.

■ Virginia has adopted the Uniform Trade Secrets Act, which defines a "trade secret" as:

> information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va.Code Ann. § 59.1–336. Trade secrets rights do not survive when otherwise protectible information is disclosed to others, such as customers or the general public, "who are under no obligation to protect [its] confidentiality...." *Secure Services Technology, Inc. v. Time & Space Processing, Inc.,* 722 F.Supp. 1354, 1361 (E.D.Va.1989) (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)). Trade secrets also do not survive when the alleged owner fails to take "reasonable precautions" to keep the information secret. *Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655 (4th Cir.1993), *cert. denied* — U.S. —, 114 S.Ct. 443, 126 L.Ed.2d 377 (1993). The Supreme Court found that triable issues of fact existed concerning whether valid business justifications existed. Here, there is no question that MAI had a valid reason for taking its actions—the protection of its copyrighted material.

---

**17.** This crucial point also serves to distinguish MAI's actions from those involved in *Kodak,* — U.S. at —, 112 S.Ct. at 2091. There, Kodak's actions were not taken to protect any copyrighted materials. Rather, Kodak attempted to justify its actions on "valid business reasons" grounds.

Close scrutiny of the summary judgment record discloses that factual issues abound with respect to whether certain material constitutes trade secrets, whether these materials were appropriately safeguarded, and finally whether they were misappropriated under the Virginia Code.[18] Because plaintiffs have successfully raised genuine issues of material fact, MAI's motion for summary judgment on the issue of trade secret misappropriation must be denied.

## IX.

For the reasons stated, MAI's motion for summary judgment on its copyright infringement claim and on plaintiffs' Sherman Act claims is granted. Accordingly, plaintiffs' complaint must be dismissed. MAI's motion for summary judgment on its misappropriation of trade secrets claim is denied. Remaining at issue in the case, therefore, are the following claims of MAI's counterclaim:

1. Under Count I, damages for copyright infringement;

2. Count II, misappropriation of trade secrets;

3. Count III, breach of contract, against counterclaim-defendant Francis;

4. Count IV, interference with economic relations; and

5. Count V, interference with prospective business advantage.

An appropriate order will issue.

---

18. "Misappropriation" is defined under the Virginia Code as:
(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(2) disclosure or use of a trade secret of another without express or implied consent by a person who:
(a) used improper means to acquire knowledge of the trade secret; or
(b) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iv) acquired by accident or mistake. Section 59.1–336.